# CIRCUIT COURT OF LOUDOUN COUNTY

San Jose Construction Group, Inc.

v.

Loudoun County School Board

December 15, 1998

Case No. (Chancery) 18591

BY JUDGE JAMES H. CHAMBLIN

This case came before the Court on November 16, 1998, for hearing on the Amended Petition of San Jose Construction Group, Inc. ("San Jose"), pursuant to Virginia Code § 11-70(C) arising out of the award by the Loudoun County School Board of a construction contract for Stone Bridge High School to Howard Shockey & Sons, Inc. ("Shockey"). For the reasons hereinafter stated, the Amended Petition is granted, and the award of the contract to Shockey is reversed and declared null and void.

### Facts

The parties stipulated most of the facts. Each party offered some additional evidence at the hearing. The evidence is essentially undisputed. The facts are summarized below to the extent necessary to explain my ruling.

On May 28, 1998, the School Board issued an Invitation to Bid for the construction of a new high school in Loudoun County. The Invitation to Bid requested bidders to bid on a base contract, plus eleven Alternates. The Alternates are not alternatives to items in the base bid. The Alternates are actually additional items to be bid upon over and above the base bid. They are called Alternates in this opinion because that is the term the Board used for them in its Invitation to Bid.

The Invitation to Bid provided in at least two places the following: "The Owner [School Board] reserves the right to award a contract based solely on the basis of Base Bid Proposal or the Base Bid Proposal and any combination of Alternates thereto." On June 30, 1998, the School Board received bids for the construction of Stone Bridge High School. San Jose and Shockey were two of four bidders who submitted timely and responsive bids.

On June 30, 1998, the sealed bids were opened and reviewed in the office of Evan Mohler, Assistant Superintendent for Support Services. When the bids were opened, the identity of each bidder was revealed. The bids were tabulated by Mr. Mohler.

As between Shockey and San Jose, the bids were as follows:

|  | *Shockey* | *San Jose* |
|---|---|---|
| Base Bid: | $27,289,000.00 | $27,300,000.00 |
| Base Bid plus the six Alternates selected by the Board: | $28,004,000.00 | $28,040,500.00 |
| Base Bid plus eleven Alternates: | $28,568,500.00 | $28,542,500.00 |

The base bids plus Alternate bids of both Shockey and San Jose were under the amount budgeted by the School Board for the project. San Jose and Shockey are both responsible bidders.

The School Board did not establish prior to the time the bids were opened any basis for determining which Alternates would be selected or any order of priority for the selection of the Alternates. Some of the Alternates involved projects that have never been awarded through the public bidding process.

A committee composed of Dr. Edgar B. Hatrick, Superintendent of Loudoun County Public Schools, Mark Burke, Director of Construction, and Mr. Mohler reviewed the bids, including the Alternate bids. Based upon the needs of the students, their health and safety, and the "political climate" of the County in favor of control of spending for school construction, the Committee selected six of the Alternates for recommendation to the School Board. The Committee did not keep a running tally of the bids for the Alternates selected. The identity of a bidder had nothing to do with the selection or elimination of an Alternate.

All of the facts and circumstances considered in selecting the Alternates also existed when the Invitation to Bid was issued on May 28, 1998.

When the base bids and bids for the Alternates selected were totaled, Shockey became the low bidder at $28,004,000.00, which was $36,500.00 less than the bid of San Jose for the base bid and the six Alternate bids. San Jose had been the lower bidder for the base bid, plus all eleven Alternates by $26,000.00.

The School Board met on July 14, 1998, to consider the bids. At the meeting, at least one member of the School Board questioned the process of base bids and Alternate bids. The School Board voted to accept the six recommended Alternates and to award the contract to Shockey based on its base bid and the six Alternate bids.

San Jose filed a protest of the award to Shockey pursuant to § 11-66. The protest was denied, and San Jose initiated legal action pursuant to § 11-70(C) in a timely fashion.

The Virginia Public Procurement Act (VPPA), Virginia Code §§ 11-35 *et seq.*, governs public procurement by the School Board and, specifically, the Invitation to Bid, bidder selection, and the award of the construction contract for Stone Bridge High School.

### *Legal Conclusions*

The School Board filed a Demurrer to the Amended Petition. Two of the grounds, namely, that the Amended Petition alleges new issues not submitted by San Jose in its written protest and that San Jose cannot challenge the validity of the terms and conditions of the Invitation to Bid in this proceeding, were addressed initially at the hearing on November 16, 1998. The Demurrer was overruled on both grounds. Section 11-66, which concerns the protest of the award, does not state that the unsuccessful bidder is bound in a legal action under § 11-70(C) to assert only the issues raised in the protest. Under § 11-70(C), San Jose may challenge the award of the contract, and the award shall be reversed if it establishes one or more of the following:

(1) that the award is not an honest exercise of discretion, but rather is arbitrary or capricious; or

(2) that the award is not in accordance with the Constitution of Virginia, applicable state law or regulation, or the terms and conditions of the Invitation to Bid.

San Jose does not challenge the terms and conditions of the Invitation to Bid, but it does challenge the manner in which the award was made, *i.e.*, the way the bids were received, reviewed, and acted upon by the School Board.

The other grounds of the Demurrer concern the merits of the Amended Petition. The Demurrer is, therefore, overruled on these grounds because San Jose has prevailed on the merits.

Counsel have not cited, and I have been unable to find, any authority, whether from Virginia or another jurisdiction, directly on point. Cases cited which are close to this case are addressed later in the opinion. Absent such authority, the VPPA must first be examined because authority for the procurement process utilized by the School Board is found solely in the VPPA. The sections of the VPPA with particular application to this case are summarized below.

Virginia Code § 11-35(G) provides:

> To the end that public bodies in the Commonwealth obtain high quality goods and services at reasonable cost, that all procurement procedures be conducted in a fair and impartial manner with avoidance of any impropriety or appearance of impropriety, that all qualified vendors have access to public business and that no offeror be arbitrarily or capriciously excluded, it is the intent of the General Assembly that competition be sought to the maximum feasible degree, that individual public bodies enjoy broad flexibility in fashioning details of such competition, that the rules governing contract awards be made clear in advance of the competition, that specifications reflect the procurement needs of the purchasing body rather than being drawn to favor a particular vendor, and that the purchaser and vendor freely exchange information concerning what is sought to be procured and what is offered.

This section sets forth the objectives of the VPPA. Importantly, the process should avoid the appearance of impropriety and should reflect the true procurement needs of the purchasing body.

The School Board points out that the objectives of § 11-35(G) also include that procurement procedures be designed to obtain high quality goods and services at reasonable cost, to foster competition to the maximum feasible degree and to give it broad flexibility in fashioning the details of competition. It seems to argue that these objectives should prevail over avoidance of the appearance of impropriety. Section 11-35(G) does not give any one objective more importance than another. All the objectives have equal importance, and

all the objectives must be satisfied for the award to have been made in accordance with § 11-35(G).

Contrary to the assertion of the School Board, the language of § 11-35(G) is not just hortatory. I agree with the opinion of Judge Randall G. Johnson, Circuit Court of the City of Richmond, in *First Health Services Corp. v. Commonwealth*, 35 Va. Cir. 184 (1994), wherein he states:

> While defendants contend that this section is "aspirational" only —
> that is, that it is unenforceable by itself — the court agrees with First
> Health that where an appearance of impropriety exists, a procurement
> award may be reversed. This is so because Va. Code § 11-70(C)
> allows reversal where an award is "not in accordance with ...
> statutes." Section 11-35(G) is a statute, and procurement actions are
> supposed to be in accordance with it.

35 Va. Cir. at 192. When *First Health Services Corp.* was decided in 1994, § 11-70(C) contained "statutes, regulations" instead of "applicable state law or regulation." The statute was amended in 1997. The amendment does not detract from Judge Johnson's opinion because a statute is a state law.

The process utilized by the School Board to select Shockey is "competitive sealed bidding." This term is defined in § 11-37 as including five elements. For purposes of this case, the most important element of competitive sealed bidding is that the award be made "to the lowest responsive and responsible bidder." Competitive sealed bidding was required for this construction project by § 11-41(C)(2).

Section 11-53 requires that a "responsive bid from the lowest responsible bidder shall be accepted as submitted, except if the bid from the lowest responsible bidder exceeds available funds ... ." The exception does not apply here because the subject bids came in under budget.

In approaching an attack on a public procurement award under § 11-70(C), I agree with the approach articulated by Judge Johnson in *First Health Services Corp.* If the unsuccessful bidder shows that the award was made in the face of an appearance of impropriety, a prima facie case of actual impropriety is established. Then the burden shifts to the purchasing body to demonstrate that the apparent impropriety is only illusory and that it did not have any actual impact on the selection process.

*Appearance of Impropriety*

The VPPA does not specifically prohibit or allow the Alternate bid procedure. Just because the VPPA does not preclude the procedure does not mean that it is permitted. However, the whole public procurement process utilized by the School Board must comply with the provisions of the VPPA.

There is a presumption that a public official complies with his official charge, but such a presumption cannot withstand a showing that an appearance of impropriety does have an actual impact on the award process.

San Jose does not allege, and evidence does not in any way support, any wrongdoing, fraud, or any other actual impropriety on the part of the School Board or its staff. The School Board offered a reasonable explanation for each of the Alternates selected. There is no evidence that any Alternate or group of Alternates was selected because of a particular bidder.

The threshold issue is whether the process utilized by the School Board creates an appearance of impropriety. The facts of this case clearly demonstrate that the Alternate bid process as utilized by the School Board for the Stone Bridge High School construction contract created an appearance of impropriety.

The VPPA requires an award to the lowest responsive and responsible bidder. San Jose was a responsive and responsible bidder. It submitted the lowest bid for the base contract plus all eleven Alternates. Yet because of certain actions by the School Board after the bids were submitted, San Jose was no longer the low bidder for what the School Board ultimately wanted to construct. By selecting some of the Alternates, the School Board made San Jose no longer the low bidder. The School Board did this knowing who the bidders were and what their bids were for the base contract and all the Alternates.

It is easy to see that by manipulation of the Alternates selected or rejected, the School Board could award the contract to a favored bidder. In its basest terms, the School Board, having access to the names of the bidders, had the opportunity to play favorites by simply deciding which Alternates to accept or reject.

The opportunity to play favorites is contrary to the purpose of the VPPA. See § 11-35(G).

San Jose is a Maryland corporation. Shockey is a Virginia corporation. Shockey has bid upon, and been awarded, construction contracts by the School Board in the past. This is the first time that San Jose has bid on a Loudoun school job. The foregoing, on its face, raises an appearance of discrimination in that the Board awarded the contract to a Virginia company with which it had

done business before to the detriment of a foreign corporation bidding for the first time. There is, however, no evidence whatsoever that the fact that San Jose is a foreign corporation bidding for the first time had any actual impact on the selection process. Regardless, the appearance of an impropriety is there.

Section 11-35(G) states as an objective under the VPPA that the bid specifications reflect the procurement needs of the purchasing body. At least two Alternates, namely, a concession stand building and tennis court lighting, were never items that would have been recommended because no other high school had them. Yet, they were included as Alternates so that the staff would have an idea of their value. Also, the inclusion of Alternates in the Invitation to Bid without knowing whether any of them would be accepted by the Board tends to show that the Alternates are not needs but more in the nature of items to be accepted if the circumstances favor them. With the other concerns noted above, this only adds to the appearance of impropriety.

San Jose has demonstrated an appearance of impropriety in the way the contract was awarded to Shockey.

### The Appearance of Impropriety Is Not Illusory

The School Board argues that any appearance of impropriety is illusory because there has been no wrongdoing, fraud, actual impropriety, or improper motive shown for what the School Board did in awarding the contract. In other words, it argues that even if the process has the potential for impropriety, the process is legally sufficient if there has been no actual impropriety and the School Board has a rational justification for its Alternate selections. I do not agree with this analysis.

It is more important that the integrity of the public procurement system be upheld and shielded from an appearance of impropriety than that an award be upheld that was made without impropriety, fraud, wrongdoing, or improper motive in a process inherently fraught with the opportunity to play favorites. Upholding the integrity of the system and shielding it from an appearance of impropriety also outweigh any benefit the School Board might achieve due to the flexibility of the Alternate Bid process.

Furthermore, the circumstances that created the appearance of impropriety, *i.e.*, the ability of the School Board to change the low bidder by selecting only certain Alternates after the identity of all the bidders is known, had an actual impact on the contract award. The impact occurred when the overall low bidder (based on the base bid plus all eleven Alternate bids) was not awarded the contract.

The appearance of an impropriety is not illusory. The School Board did not need to know the names of the bidders in order to make a decision on the Alternates. This knowledge of the bidders' names flawed the process of selecting or rejecting Alternates.

Counsel have not cited any Virginia authority directly on point. The non-Virginia cases cited by the School Board concern bids on substituted materials or equipment and not additional add-on bid items as in this case. *Fonseca v. Board of Education*, 294 N.Y.S.2d 952 (1968) (bidders allowed to substitute equivalent materials); *Automatic Merchandising Corp. v. Nusbaum*, 210 N.W.2d 745 (Wisc. 1973) (bidders could submit bids based on reconditioned equipment as opposed to new equipment); *J.J.D. Urethane Co. v. Montgomery County*, 694 A.2d 368 (Pa. 1997) (bidders on roofing project could bid using either temporary exterior elevator or stairway); *L. G. DeFelice and Son, Inc. v. Argraves*, 118 A.2d 626 (Conn. 1955) (bidders on a highway project could bid alternately using reinforced concrete or bituminous concrete); *L & M Properties Co., Inc. v. Burke*, 86 N.E.2d 768 (Ohio 1949) (bidders on road project could bid on construction with either asphalt or concrete).

However, the case of *FTR International, Inc. v. City of Pasadena*, 62 Cal. Rptr. 2d 1 (1997), cited by San Jose is very close factually and reaches the same result as herein. In *FTR International*, the City of Pasadena, California, solicited bids for the second phase of the construction of a community health center. Due to budget constraints, the city invited bids for the portion of the work it knew it wanted to build. This was called the base bid. It also solicited bids for nine alternatives which the city would contract for only if the budget permitted. The bid invitation clearly stated that the determination of which bid to select was in the sole discretion of the city. FTR International submitted the low base bid. The city decided to select certain alternates, and when the bids for the base work plus the selected alternates were totaled, the third lowest bidder on the base work became the low bidder. The California Court of Appeals found in favor of FTR International stating:

> We must ascertain whether the use of the alternative bid procedure comported with the purposes of competitive bidding. We conclude that such a procedure does not violate the City's competitive bidding law as it allows the City to make the most economical use of its resources and deal with a problem in a sensible and practical way.
>
> However, although the procedure helped insure economy, it did not exclude favoritism. As more expressly recognized in appellant's reply brief, part of the procedure allowed for the appearance of impropriety. When the City selected which alternatives to add, the

names of the bidding contractors were on the tabulation sheet. Having access to the names of potential bidders afforded the City the opportunity to play favorites. Accordingly, we conclude that part of the procedure should be eliminated from any future use of alternative bidding, and some sort of blind identification of bidders should be used until after the decision of which bidder was the "lowest and best," *i.e.*, the lowest responsible bidder. Alternatively, the City could determine the order of the alternatives prior to opening the bids.

62 Cal. Rptr. 2d at 5.

In *First Health Services Corp.*, which involved an award of a computer system contract for the Virginia Medical Assistance Program, the unsuccessful bidder, First Health Services Corp., showed an appearance of impropriety because the successful bidder, Electronic Data Systems Corporation (EDS), had hired, in the interval between the issuance of the invitation to bid and the award of the contract, an employee of the department that would be using the computer system. Judge Johnson found that the appearance of impropriety was illusory because the employee's hiring was used minimally by EDS in the procurement process; the employee did not work in the part of the department that would be using the computer system, and each person involved in the selection process gave no credit for the employee's prior experience in the department.

The factual situation in *First Health Services Corp.* is not the same as in the present case. The appearance of the impropriety (the hiring of the former state employee by the successful bidder) in that case had no impact on the selection process. However, in this case, the appearance of impropriety (that the Board selected the Alternates knowing the identity and amounts of each base bid and Alternate bid) actually impacted the selection process because the overall low bidder was not the successful bidder. The flaw in the process used by the School Board actually resulted in a decision that could have occurred if the School Board had actually indulged in some form of wrongdoing to play favorites.

In *Griswold v. Ramsey County*, 65 N.W.2d 647 (Minn. 1954), the Court invalidated contracts awarded under a procedure that allowed a bidder to reduce its bid after it was awarded a contract if the purchasing body decided to make post-contract award changes in the project. The court stated:

Generally, it is presumed that public officials have entered into public contracts in good faith and actual fraud in a particular instance must be proved, but this rule has no application in a determination of

whether the requirements of competitive bidding have been met in the letting of a contract and, as a matter of sound public policy, such a contract is void, without any showing of actual fraud or an intent to commit fraud, if a procedure has been followed which emasculates the safeguards of competitive bidding.

65 N.W.2d at 652.

Any process which has the potential for opening the door to fraud or other wrongdoing emasculates the safeguards of competitive bidding. Applying this rationale to the facts of this case, it shows that the appearance of impropriety is not just illusory.

### Relief Granted

While I have no reason to believe that the School Board or any of its staff engaged in any wrongdoing or acted in a way to deliberately favor one bidder over another, the Alternate bid procedure as utilized by the School Board in this case undermines the purpose of the VPPA and its competitive bidding process. The process vested too much discretion in the School Board after the bids were opened. The discretion is given the School Board in formulating the Invitation to Bid, and not in the selection process. Therefore, the contract was awarded to Shockey not in accordance with state law. The contract award to Shockey is reversed and declared null and void. This is the full extent of any relief that can be granted to San Jose under § 11-70(C).